**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| W. SILVER RECYCLING, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:20-CV-00837 JAR |
| | ) | |
| NIDEC MOTOR CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

This matter is before the Court on Defendant Nidec Motor Corporation's Motion to Dismiss. (Doc. 9). The motion is fully briefed and ready for disposition. For the reasons discussed below, the motion will be granted in part and denied in part.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

On August 31, 2018, Plaintiff W. Silver Recycling, Inc. ("WSR") and Defendant Nidec Motor Corporation ("Nidec") executed a Scrap Management Agreement (the "Agreement"). (Doc. 1 at ¶ 12; Doc. 4-1).[1] Pursuant to the Agreement, WSR would process and purchase scrap metal created as a by-product of Nidec's manufacturing at seven facilities until August 31, 2021. (Doc. 1 at ¶¶ 12-14). On April 16, 2020, Nidec informed WSR that, specifically as to the Nidec Laminaciones de Acero SA de CV facility ("NLA"), Nidec was "aggressively looking to improve revenue and is prepared to test the market." (*Id.* at ¶ 40). WSR promptly replied that the parties "are of course under contract," and NLA "falls under the contract." (*Id.* at ¶¶ 41-42). On June 9, 2020, Nidec informed WSR that it "no longer requires" WSR's scrap management services at

---

[1] There is some confusion as to whether August 31, 2018 or November 5, 2018 is the effective date of the Agreement, but this question is not material to the current dispute.

NLA. (*Id.* at ¶ 43). Nidec is currently selling the NLA scrap metal to the buyer who preceded WSR while allegedly continuing to utilize WSR's equipment. (*Id.* at ¶¶ 46-47).

Approximately two weeks after being informed its services were no longer necessary, WSR filed the instant Complaint including the following counts:

I.    Breach of Contract – Specific Performance
II.   Breach of Contract – Damages
III.  Breach of Implied Covenant of Good Faith and Fair Dealing
IV.   Negligent Misrepresentation

WSR's overarching argument is that the Agreement constituted an exclusive arrangement which Nidec has breached by terminating services at NLA without following the termination procedures of the Agreement. (*Id.* at ¶ 61 ("Defendant terminated the Agreement without cause and without following the procedural requirements set out in the Agreement for termination.")). In its Motion to Dismiss, Nidec argues that WSR cannot establish breach of contract as a matter of law because the Agreement is not exclusive, so there has been no termination.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (citations omitted).

"When ruling on a motion to dismiss [under Rule 12(b)(6)], the district court must accept the allegations contained in the complaint as true and all reasonable inferences from the complaint must be drawn in favor of the nonmoving party." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001). A complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of a claim entitling him to relief." *Id.* Dismissal is warranted, however, when actions "are fatally flawed in their legal premises and designed to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Id.*

## III.   DISCUSSION

### A.   Counts I-II – Breach of Contract[2]

WSR alleges that Nidec breached the Agreement by terminating without cause and without following the procedural requirements for termination. (Doc. 1 at ¶¶ 61, 71). Under Missouri law, a breach of contract claim requires the following elements: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney v. Missouri Military Acad.*, 304 S.W.3d 98, 104 (Mo. banc 2010) (citing *Howe v. ALD Servs., Inc.*, 941 S.W.2d 645, 650 (Mo.App. 1997)). Nidec claims that, as a matter of law, it has not breached the agreement. The critical question is whether Nidec terminated the Agreement (and accordingly failed to abide

---

[2] Counts I and II both allege breach of contract; the only distinction is that Count I seeks specific performance while Count II seeks damages.

by the Agreement's termination procedures) by determining that it would not sell the NLA scrap to WSR.

The Agreement is brief, comprising only six pages excluding the exhibits. Yet the parties offer two entirely different interpretations of the Agreement's purpose. According to WSR, the parties "intended to create an exclusive relationship" pursuant to which WSR would be the only purchaser of scrap metal at the seven facilities. (Doc. 14 at 7). Alternatively, Nidec argues that the Agreement "allows the parties to have a common understanding of how they each will operate regarding the scrap recycling when the recycling is requested [by Nidec]." (Doc. 15 at 6).

WSR contends that because the Agreement constitutes an exclusive arrangement, ceasing sale of scrap metal to WSR at NLA constitutes termination, and Nidec has failed to comply with the termination provisions of Article 4. Nidec effectively admits that it has not complied with these termination provisions but argues that is because no termination has occurred. WSR identifies four specific sections which supposedly establish an exclusive arrangement:

> **Article 1.3:** "[WSR] will provide ferrous and non-ferrous scrap management services at [the seven facilities] [a]nd any other location that [Nidec] in its sole discretion may choose to add to this Agreement, upon written notice to [WSR]."

> **Article 2.1:** "At times specified, [WSR] will transfer and remove, or will arrange for the transfer and removal of . . . scrap located at the facility locations specified by [Nidec]."

> **Article 2.2:** "[WSR] shall pay [Nidec] for scrap removal from [Nidec's] locations in accordance with the price sheet listed in **Exhibit C** attached hereto." (Doc. 4-1).

> **Article 4:** The Agreement "may be terminated by [Nidec] or by [WSR] at any time immediately upon written notice in the event of the other party's material breach of any term of provision of this Agreement, after a 30 day cure period has been provided to the other party to come into compliance." (Doc. 4-1).

WSR argues that Article 1.3 "sets out [WSR's] contractual obligations" and therefore "also creates [WSR's] right to meets its obligations." (Doc. 14 at 3). WSR similarly contends that Articles 2.1

- 4 -

and 2.2 set out mandatory obligations. Finally, according to WSR, the termination provisions of Article 4 serve no purpose if Nidec can simply choose to stop services at one facility, especially given there "is no provision for partial revocation or partial performance, or select discontinuance of services." (Doc. 14 at 6).

Nidec does not rely on specific portions of the Agreement for its argument; instead, Nidec highlights the Agreement's silence as to exclusivity. Simply put, the Agreement does not explicitly state that WSR will be Nidec's exclusive scrap metal seller. The Agreement only uses the word exclusive once, but in reference to exclusive jurisdiction and venue. (Doc. 4-1 at Art. 7). In its reply, Nidec argues that the sections cited by WSR in an "attempt[] to patch together an exclusivity requirement" actually buttress Nidec's interpretation of the Agreement. (Doc. 15 at 5). Nidec claims, for example, that the phrase "[a]t times specified" in Article 2.1 establishes that "Nidec has the contractual right to say when [WSR] can come to its identified facilities for scrap." (*Id.* at 6).

"The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention." *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc 1973). When a contract contains an integration clause, as the Agreement does,[3] parol evidence may only be considered if there is an ambiguity which cannot be resolved within the four corners of the contract. *See Tribus, LLC v. Greater Metro, Inc.*, 589 S.W.3d 679, 702 (Mo.App. 2019). If the Agreement is unambiguously non-exclusive, then Nidec has not breached because its decision to use another company at NLA does not constitute a

---

[3] "Entire Agreement. This Agreement contains entire agreement between the parties with respect to the subject matter of said Agreement and supersedes all prior agreements, agreements [sic] or understandings with respect to such matters. No course of prior dealings and no usage of trade will be relevant to supplement or explain any terms used in this Agreement." (Doc. 4-1, Art. 17).

termination. Alternatively, if there is ambiguity as to exclusivity, WSR may demonstrate exclusivity through parol evidence and dismissal at this stage would be premature.

The presence of ambiguity is a question of law. *See Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 846 (Mo. banc 2012). "A contract is ambiguous only if its terms are susceptible to more than one meaning so that reasonable [persons] may fairly and honestly differ in their construction of the terms." *Eisenberg v. Redd*, 38 S.W.3d 409, 411 (Mo. banc 2001) (quoting *Jake C. Byers, Inc. v. J.B.C. Invs.*, 834 S.W.2d 806, 816 (Mo.App. 1992)). "An ambiguity arises where there is duplicity, indistinctness or uncertainty in the meaning of the words used in the contract." *Patterson v. Rough Road Rescue, Inc.*, 529 S.W.3d 887, 894 (Mo.App. 2017) (citing *J.H. Berra Constr. Co., Inc. v. City of Washington*, 510 S.W.3d 871, 874-75 (Mo.App. 2017)). A contract is "not ambiguous simply because the parties disagree over its meaning." *Yerington v. La-Z-Boy, Inc.*, 124 S.W.3d 517, 520 (Mo.App. 2004) (citing *Cosky v. Vandalia Bus Lines, Inc.*, 970 S.W.2d 861, 865 (Mo.App. 1998)).

Under Missouri law, "[i]t has long been held that 'an ambiguity cannot be created by silence, especially when both parties are sophisticated bargainers.'" *Morelock-Ross Props., Inc. v. English Village Not-for-Profit Sewer Corp.*, 308 S.W.3d 275, 280 (Mo.App. 2010) (citing *Halls Ferry Invs., Inc. v. Smith*, 985 S.W.2d 848, 853 (Mo.App. 1998)). The Supreme Court of Missouri has recently framed this principle slightly differently while citing *Morelock-Ross Props.*, stating that a "contract's silence about an issue *does not necessarily create* an ambiguity." *State ex rel. Greitens v. Am. Tobacco Co.*, 509 S.W.3d 726, 737 (Mo. banc 2017) (emphasis added). At minimum, there must be some hint of exclusivity in an Agreement to establish ambiguity in a contract between sophisticated bargainers under Missouri law.

There is minimal directly applicable precedent. In *Propane Indus., Inc. v. General Motors Corp.*, the court (applying Kansas law) held that an express promise by the defendant to purchase exclusively from the plaintiff could not be implied from the terms of the agreement. 429 F. Supp. 214, 219 (W.D. Mo. 1977). As WSR notes, however, the court specifically concluded that exclusivity could not be implied "because of the ambiguity of the language employed." *Id.* Alternatively, in *Universal Power Sys., Inc. v. Godfather's Pizza, Inc.*, the Eighth Circuit distinguished *Propane Indus., Inc.* and upheld a jury verdict that a requirements contract which failed to use the word exclusive was, in fact, exclusive. 818 F.2d 667 (8th Cir. 1987). The court relied in part, however, on the parties' prior course of dealing to reach this conclusion.

Nidec directs this Court's attention to *Sam Auction Software, LLC v. Int'l Auction Partners, Inc.* Case No. 2:19-CV-798, 2019 WL 6699447 (S.D. Ohio Dec. 9, 2019). The facts of *Sam Auction Software* are comparable to the case at hand. Plaintiff hosted an Online Venue Platform for auctions, and defendant paid plaintiff a monthly fee as well as an additional fee for each auction listed on the platform. While the contract remained in place, defendant ceased using plaintiff to host the Online Venue Platform, instead choosing to conduct its auction business on another platform. Defendant claimed the contract was silent on the issue of exclusivity and therefore unambiguously non-exclusive, while Plaintiff argued that "language in the Agreement [] not only suggests but compels a conclusion that the parties intended" an exclusive arrangement. Like WSR here, the plaintiff cited numerous contractual provisions which allegedly implied exclusivity. The court, applying Ohio law, granted defendant partial judgment on the pleadings because "it is outside the purview of the Court to rewrite the parties' contract if the 'contract is silent, as opposed to ambiguous, with respect to a particular matter.'" *Id.* at *6 (quoting *Savedoff v. Access Group,*

*Inc.*, 524 F.3d 754, 764 (6th Cir. 2008). WSR argues that the provisions of the Agreement, unlike those in *Sam Auction Software*, demonstrate ambiguity. (Doc. 14 at 10).

Recently, a federal court in Pennsylvania faced a similar question. In *Capitol Presort Services, LLC v. XL Health Corp.*, the defendant executed a three-year contract for mail sorting services, and such term "shall continue from year to year" with termination only occurring with notice and at the end of a term. 175 F. Supp. 3d 430, 432 (M.D. Pa. 2016). When defendant informed plaintiff it "will no longer be in need of [plaintiff's] services" in the middle of the term, plaintiff "asserted a breach of contract claim stemming from [defendant's] unilateral termination." *Id.* The court found that the "express written terms of the agreement are silent as to quantity, frequency, and exclusivity, effectively permitting [defendant] not to commission [plaintiff's] services at all." *Id.* at 436; *see also Assalone v. S-L Distrib. Co.*, 978 F. Supp. 2d 427, 434 (M.D. Pa. 2013) ("[A] right as substantial as exclusivity, if intended, must be expressly stated.").

Some courts have been willing to find the issue of exclusivity ambiguous even if the word exclusivity was not specifically used. In *Global BTG LLC v. Nat'l Air Cargo, Inc.*, for example, the court noted that "New York courts have recognized that in certain circumstances, the terms of an agreement and the circumstances under which it was executed can give rise to a clear inference of exclusivity." Case No. CV 11-01657 MMM (JCGx), 2013 WL 12121983, at *14 (C.D. Ca. Jan. 7, 2013); *see also Kaeser Compressors, Inc. v. Compressor & Pump Repair Servs., Inc.*, No. 09-C-521, 2009 WL 3055341, at *3 (E.D. Wis. Sept. 18, 2009) (noting contractual language that "[a]ll sales leads in your territory . . . will be forwarded to [plaintiff]"). The thrust of these cases, however, is that there must be some term in the contract permitting the court to determine that the intent of the parties as to exclusivity is ambiguous.

Considering only the language in the Agreement, including the particular sections cited by WSR, this Court can find no contractual hook on which to hang an allegedly exclusive arrangement. Article 1.3 comes closest by stating that WSR "will provide" the scrap management services, but virtually every contract could be considered exclusive if the word "will" were sufficient to establish an ambiguity as to exclusivity. As Nidec notes, moreover, the use of the phrase "[a]t times specified" in Article 2.1 suggests non-exclusivity. Article 2.2 simply states that Nidec "shall pay" at the rates provided in the exhibit, but this hardly establishes an exclusive relationship or any sort of minimum quantity requirement. Finally, nothing about Article 4 indicates exclusivity; it is perfectly logical for a non-exclusive contract to include termination requirements.

This Court is cognizant that its "duty is confined to the interpretation of the contract which the parties have made for themselves . . . and a court may not read into a contract words which the contract does not contain." *Lawn Managers, Inc. v. Progressive Lawn Managers, Inc.*, 959 F.3d 903, 913 (8th Cir. 2020) (quoting *Textor Constr., Inc. v. Forsyth R-III Sch. Dist.*, 60 S.W.3d 692, 698 (Mo.App. 2001)). Under Missouri law, the "court's role is to determine the intention as manifested not by what the parties say now they intended but by the document." *Press Mach. Corp. v. Smith R.P.M. Corp.*, 727 F.2d 781, 784 (8th Cir. 1984). This Court does not deny the theoretical possibility that the parties in fact intended an exclusive arrangement. But there is no actual language in the Agreement permitting a reasonable person to conclude that WSR and Nidec had an exclusive arrangement, and therefore Nidec could not have breached the Agreement as a matter of law. Accordingly, the Motion to Dismiss will be granted as to Counts I and II.

B. Count III – Breach of Implied Covenant of Good Faith and Fair Dealing

In Count III of the complaint, WSR alleges that Nidec breached its duty of good faith and fair dealing by exercising its judgment under the contract in a manner that denied WSR the expected benefit of the transaction. (Doc. 1 at ¶¶ 75-78). Nidec argues that Count III must be dismissed because it is duplicative of Counts I and II and not a separate cause of action under Missouri law. (Doc. 10 at 8-9). WSR responds that the duty of good faith and fair dealing "imposes a different test than does a count for breach of contract." (Doc. 14 at 11).

"Missouri law implies a covenant of good faith and fair dealing in every contract." *Farmers' Elec. Coop., Inc. v. Missouri Dep't of Corr.*, 977 S.W.2d 266, 271 (Mo. banc 1998). This duty prevents a party from "exercis[ing] a judgment conferred by the express terms of the contract in such a manner that evades the spirit of the transaction or denies the other party the expected benefit of the contract." *Countrywide Servs. Corp. v. SIA Ins., Co.*, 235 F.3d 390, 393 (8th Cir. 2000) (quoting *Acetylene Gas Co. v. Oliver*, 939 S.W.2d 404, 410 (Mo. App. 1996)). "The purpose of the cause of action is to 'prevent opportunistic behavior where one party exploits changing economic conditions to the detriment of the other party.'" *Rock Port Market, Inc. v. Affiliated Foods Midwest Coop., Inc.*, 532 S.W.3d 180, 188 (Mo.App. 2017) (quoting *Glenn v. HealthLink HMO, Inc.*, 360 S.W.3d 866, 877 (Mo.App. 2012)). The covenant is not, however, "an ever-flowing cornucopia of wished-for legal duties." *Comprehensive Care Corp. v. RehabCare Corp.*, 98 F.3d 1063, 1066 (8th Cir. 1996).

Count III is not inherently duplicate of Counts I and II. "[A] claim of breach of a duty of good faith and fair dealing is not fundamentally inconsistent with or duplicative of a breach of contract claim. Two claims are inconsistent if 'proof of one necessarily negates, repudiates, and disproves the other.'" *Margolies v. McCleary, Inc.*, 447 F.3d 1115, 1125 (8th Cir. 2006) (quoting

*Trimble v. Pracna*, 167 S.W.3d 706, 711 (Mo. 2005)). At this early stage, this Court cannot

determine as a matter of law that Count III is necessarily duplicative of Counts I and II. This Court

has determined that the Agreement is unambiguously not exclusive. As WSR notes, however, this

determination does not preclude a finding that Nidec has exercised its judgment in a manner that

"evades the spirit of the transaction." (Doc. 14 at 12). Dismissal of Count III on such grounds

would be inappropriate at this early stage of litigation.[4]

Nidec next argues that there is no independent cause of action for the breach of the implied

covenant of good faith and fair dealing under Missouri law. Mo. Rev. Stat. § 400.1-304 states that

"[e]very contract or duty within this chapter imposes an obligation of good faith in its performance

and enforcement."[5] This statute mimics U.C.C. § 1-304, and Nidec relies extensively on Comment

1, which provides:

> This section does not support an independent cause of action for failure to perform
> or enforce in good faith. Rather, this section means that a failure to perform or
> enforce, in good faith, a specific duty or obligation under the contract, constitutes
> a breach of that contract or makes unavailable, under the particular circumstances,
> a remedial right or power. This distinction makes it clear that the doctrine of good
> faith merely directs a court towards interpreting contracts within the commercial
> context in which they are created, performed, and enforced, and does not create a
> separate duty of fairness and reasonableness which can be independently breached.
> U.C.C. § 1-304, cmt. 1.

While the comment provides that no cause of action for breach of the duty of good faith

and fair dealing may arise under the statute itself, this does not necessarily preclude the entire

existence of such a cause of action. A claim of breach of the implied covenant is a "species of a

---

[4] A particular concern with allowing duplicative claims to proceed is that a plaintiff "may not be made more than whole or receive more than one full recovery for the same harm." *Margolies*, 447 F.3d at 1126 (quoting *Kincaid Enters., Inc. v. Porter*, 812 S.W.2d 892, 900 (Mo.App. 1991)). This concern is not applicable here because Counts I and II are being dismissed.

[5] This is a Uniform Commercial Code statute, and Nidec has persuasively demonstrated through substantial precedent that the "predominant purpose" of contracts for sale of scrap metal is the sale of goods. (Doc. 15 at 7-8). *See Unisys Corp. v. Elec. Recovery, Inc.*, No. 94 C 4369, 1995 WL 746241, at *3 (N.D Ill. Dec. 7, 1995) (collecting cases).

breach of contract claim," as Nidec notes. *Steven T. Huff LLC v. Monarch Cement Co.*, No. 15-03214-CV-S-BP, 2017 WL 10506793, at *4 (W.D. Mo. June 19, 2017). But for the same reasons discussed above, this type of breach of contract claim can be distinguished from Counts I and II. In Count III, WSR alleges that Nidec denied it the expected benefits of the transaction by cutting all services at NLA; while the underlying facts are the same, Count I and II instead claim that ending services at NLA specifically violated Article 4's termination provisions. These are distinct arguments and Count III may survive even while Counts I and II are dismissed. Finally, it bears mention that the comments to the U.C.C. do not carry the force of law. *Bracey v. Monsanto Co.*, 823 S.W.2d 946, 950 n.6 (Mo. banc 1992) ("UCC comments are appropriately considered for guidance but do not constitute binding authority."). Because Count III is not necessarily duplicative of Counts I and II, the Motion to Dismiss will be denied as to Count III.

### C. Count IV – Negligent Misrepresentation

In Count IV, WSR alleges that Nidec made negligent misrepresentations that it would continue to exclusively use WSR, and that WSR reasonably relied on these assurances. (Doc. 1 at ¶¶ 81-85). Under Missouri law, negligent misrepresentation requires that "(1) the speaker provided information in the course of his or her business; (2) the information was false as a result of the speaker's failure to exercise reasonable care; (3) the speaker intentionally provided the information for the guidance of limited persons in a particular business transaction; (4) the hearer justifiably relied on the information; and (5) due to the hearer's reliance on the information, the hearer suffered a pecuniary loss." *Blevins v. Am. Family Mut. Ins. Co.*, 423 S.W.3d 837, 842 (Mo.App. 2014) (citing *Stein v. Novus Equities Co.*, 284 S.W.3d 597, 602-603 (Mo.App. 2009)).

Nidec argues that Count IV is barred by the economic loss doctrine. (Doc. 10 at 9-10). "Under the economic loss doctrine, Missouri courts will bar tort claims that seek to recover for

economic losses unless the claims are based on misrepresentations that are independent of the contract." *Nestle Purina Petcare Co. v. Blue Buffalo Co.*, 181 F. Supp. 3d 618, 638 (E.D. Mo. 2016); *see also Self v. Equilon Enters., LLC*, No. 4:00-CV-1903 TA, 2005 WL 3763533, at *11 (E.D. Mo. Mar. 30, 2005). Missouri courts have identified two key factors for determining if a negligent misrepresentation claim is independent of the contract: (1) whether the subject matter of the alleged misrepresentation was incorporated into the parties' contract; and (2) whether the plaintiff suffered additional damages outside the contract as a result of the alleged fraud.[6] *Trademark Medical, LLC v. Birchwood Labs., Inc.*, 22 F. Supp. 3d 998, 1003 (E.D. Mo. 2014) (citing *Compass Bank v. Eager Road Assocs.*, 922 F. Supp. 2d 818, 827 (E.D. Mo. 2013).[7]

This Court has determined that the agreement is unambiguously not exclusive. Accordingly, Nidec's alleged misrepresentation that WSR would be used exclusively at the facilities is unquestionably independent of the Agreement. *See K.A. by and through B.W. v. Children's Mercy Hosp.*, No. 4:18-00514-CV-RK, 2019 WL 2144815, at *5 (W.D. Mo. May 16, 2019) ("Defendant's economic loss doctrine argument is inapplicable because as determined above . . . Plaintiff has not plausibly pled a breach of contract claim."). This case is substantially similar to cases in this circuit in which courts have found that fraudulent inducement claims were not barred by the economic loss doctrine, as WSR specifically alleges that Nidec's negligent misrepresentations caused WSR to agree to unfavorable addendums. (Doc. 1 at ¶¶ 28-38, 84). *See,*

---

[6] It has been clarified that the economic loss doctrine "applies to bar claims of negligence as well as fraud" under Missouri law. *Nestle Purina Petcare Co.*, 181 F. Supp. 3d at 638.

[7] WSR claims that the economic loss doctrine does not apply to services contracts, which is itself a debatable proposition. *See OS33 v. CenturyLink Commc'ns, L.L.C.*, 350 F. Supp. 3d 807, 816 (E.D. Mo. 2018) (applying economic loss doctrine to services contract). *But see Self v. Equilon Enters. LLC*, 2005 WL 3763533, at *12 ("The Court determines that the general rule limiting plaintiffs to contract damages for economic loss governs inasmuch as the contracts at issue were for the sale of goods, not services."). Regardless, as discussed in footnote 4 of this Memorandum and Order, this court finds that the Agreement is properly interpreted as a contract for the sale of goods under the U.C.C. WSR has not meaningfully explained why this Court should treat the Agreement as one for services given the consistent precedent suggesting scrap metal recycling agreements fall under the U.C.C.

*e.g.*, *Web Innovations & Tech. Servs., Inc. v. Bridges to Digital Excellence, Inc.*, 69 F. Supp. 3d 928, 933 (E.D. Mo. 2014); *Superior Edge, Inc. v. Monsanto Co.*, 44 F. Supp. 3d 890, 903-07 (D. Minn. 2014) (applying Missouri law). This Court agrees with WSR that Nidec cannot defeat "a count for breach of contract on grounds of non-exclusivity while also def[eating] a count for misrepresentation on grounds that exclusivity is inherent in the agreement." (Doc. 14 at 14-15). Therefore, the first factor suggests WSR's negligent misrepresentation claim is independent of the contract and weighs against dismissal at this early stage of the proceeding.

Nidec contends that the second factor, however, favors dismissal because WSR seeks essentially identical damages for both the breach of contract claim and the negligent misrepresentation claim. The Court agrees with Nidec that WSR has not specifically pled special damages for the alleged misrepresentation. "But failure to identify special damages alone is not dispositive at this stage." *Spring Lake Pork, LLC v. Great Plains Mgmt.*, No. 2:19-CV-18 CDP, 2020 WL 3542292, at *3 (E.D. Mo. June 30, 2020) (citing *Web Innovations & Tech. Servs., Inc. v. Bridges to Digital Excellence, Inc.*, 69 F. Supp. 3d 928, 933 (E.D. Mo. 2014)).

Finally, the Court notes its "reluctance to dismiss claims for . . . negligent misrepresentation early in the litigation . . . . Absent further discovery, this Court cannot accurately determine whether [WSR's] claims for [negligent misrepresentation] are collateral to or interwoven in the contract." *Superior Edge, Inc.*, 44 F. Supp. 3d at 908 (quoting *U.S. Claims, Inc. v. Saffren & Weinberg, LLP*, Civ. No. 07-0543, 2007 WL 4225536, at *12 (E.D. Pa. Nov. 29, 2007)); *see also Nestle Purina Petcare Co. v. Blue Buffalo Co.*, 129 F. Supp. 3d 787, 792 (E.D. Mo. 2015). Certain of the negligent misrepresentations alleged by WSR may in fact be sufficiently related to the Agreement to be barred by the economic loss doctrine. At this early stage, however, this Court

cannot find that the entire count must be dismissed as a matter of law, especially given this Court's determination that the Agreement is unambiguously non-exclusive.

## IV.    CONCLUSION

The fully integrated Agreement is entirely silent as to exclusivity, and there is no specific contractual language permitting this Court to find ambiguity as a matter of law. As a result, Counts I and II do not plausibly state a claim for relief because there has been no termination event triggering the provisions of Article 4 or other breach of the Agreement. For the reasons previously stated, however, Counts III and IV state independent claims for relief which are neither duplicative of Counts I and II nor barred by the economic loss doctrine.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Nidec Motor Corporation's Motion to Dismiss (Doc. 9) is **GRANTED in part** and **DENIED in part.** The motion is granted as to Counts I and II but denied as to Counts III and IV.

Dated this 24th day of December, 2020.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE