UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| W. SILVER RECYCLING, INC., | ) | |
| | ) | |
| Plaintiff / Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-CV-00837 JAR |
| | ) | |
| NIDEC MOTOR CORP., | ) | |
| | ) | |
| Defendant / Counterclaim Plaintiff. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiff / Counterclaim Defendant W. Silver

Recycling, Inc.'s ("WSR") Motion for Summary Judgment on Defendant / Counterclaim

Plaintiff Nidec Motor Corporation's ("Nidec") First Amended Counterclaim (Doc. 82) and

Nidec's Motion for Summary Judgment. (Doc. 84). Both motions are fully briefed and ready for

disposition. The Court will address them in one Memorandum and Order because they concern

related issues.

I.      **BACKGROUND**

Factual Background

On August 31, 2018, WSR and Nidec entered a Scrap Management Agreement (the

"Agreement"). (Doc. 111 at ¶ 1; Doc. 4-1).[1] Pursuant to the Agreement, WSR would process and

purchase scrap metal created as a by-product of Nidec's manufacturing at seven facilities for an

---

[1] Both WSR (Doc. 86) and Nidec (Doc. 88-2) have filed Statements of Uncontroverted Material Facts ("SUMF") in support of their motions for summary judgment and responses to the opposing party's SUMF. The parties have also filed Statements of Additional Uncontroverted Material Facts ("SAUMF"). (Docs. 112, 132). Pursuant to E.D. Mo. L.R. 4.01(E), all facts included in the parties' SUMFs are deemed admitted unless the opposing party has identified a genuine issue regarding the proposed fact with specific citation to the record.

initial term of three years. (*Id.* at ¶ 2; Doc. 4-1). Nidec's Laminaciones de Acero SA de CV facility ("NLA") was included in the Agreement. (*Id.* at ¶ 5).

In April 2020, scrap metal prices substantially increased due to manufacturing shutdowns caused by the COVID-19 pandemic. (*Id.* at ¶ 7). Nidec's Commodity Manager, Oscar Magana, contacted Lane Gaddy, Chief Executive Officer and part owner of WSR ("Mr. Gaddy"), on April 16, 2020 to inform him that "[a]s part of the continuous improvement process and current challenges," Nidec had "compar[ed] selling rates currently paid for similar steel scrap as NLA [and] found that there should be an opportunity to improve the current price formula." (Doc. 131 at ¶ 6; Doc. 140-2 at ¶¶ 20, 25). Mr. Gaddy responded that WSR and Nidec "are of course under contract." (Doc. 140-2 at ¶ 26). In June 2020, Nidec informed WSR that it was discontinuing WSR's services at NLA, but not the other facilities covered by the Agreement. (Doc. 111 at ¶ 15). This litigation soon followed.

Procedural Background

On June 24, 2020, WSR filed suit in this Court bringing claims for breach of contract (Counts I and II), breach of the implied covenant of good faith and fair dealing (the "Covenant") (Count III), and negligent misrepresentation (Count IV). (Doc. 1). WSR's Complaint operates on the premise that the Agreement constituted an exclusive arrangement which Nidec breached by selecting a different scrap purchaser at NLA in June 2020. On December 24, 2020, this Court dismissed WSR's breach of contract claim because "there is no actual language in the Agreement permitting a reasonable person to conclude that WSR and Nidec had an exclusive arrangement." (Doc. 17 at 9). Having determined the Agreement was unambiguously non-exclusive, the Court held that Counts III and IV were neither duplicative of the breach of contract allegation nor barred by the economic loss doctrine. (*Id.* at 15). The Court specifically noted that it would be

improper to dismiss these claims at such an early stage of litigation. (*Id.* at 11, 14). Nidec now seeks summary judgment on WSR's remaining claims. (Doc. 84).

On April 6, 2021, Nidec filed a First Amended Counterclaim ("FAC") against WSR. (Doc. 37). In Count I of the FAC, Nidec seeks $266,000 in damages due to WSR's alleged failure to comply with its obligation to guarantee highest scrap prices available under Exhibit B, ¶ 10 of the Agreement (hereinafter the "Guaranteed Price Provision"). (*Id.* at ¶¶ 27-33). In Count II of the FAC, Nidec contends that WSR breached its indemnification obligations under Exhibit A, Article 1 of the Agreement by failing to indemnify Nidec for the cost of this litigation. (*Id.* at ¶¶ 34-43). On May 26, 2021, this Court determined that the Guaranteed Price Provision was ambiguous and accordingly declined to dismiss Count I of the FAC. (Doc. 49 at 5). The Court dismissed Count II, however, after determining that the Agreement's indemnity provision did not "expressly and unequivocally apply to breach of contract actions between the parties." (*Id.* at 10). WSR seeks summary judgment on Nidec's claim for breach of the Guaranteed Price Provision. (Doc. 82).

## II.   LEGAL STANDARD

Under Fed. R. Civ. P. 56(a), a movant is entitled to summary judgment if they can "show[] that there is no genuine dispute as to any material fact" and they are "entitled to judgment as a matter of law." *See Meier v. City of St. Louis*, 934 F.3d 824, 827-278 (8th Cir. 2019). This Court views the evidence in the light most favorable to the nonmovant when determining whether summary judgment is appropriate. *Osborn v. E.F. Hutton & Co.*, 853 F.2d 616, 619 (8th Cir. 1988). The nonmovant, however, "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial" *Torgerson v. City of Rochester*, 643 F.3d 1031,

1042 (8th Cir. 2011) (internal quotations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.   ANALYSIS

A.   WSR's Motion for Summary Judgment on Nidec's Counterclaim (Doc. 82)

The Agreement incorporates Exhibit B, titled "Special Terms and Conditions," in which WSR agrees to "[g]uarantee highest prices available for scrap material through continual improvements in freight rates, handling/segregating ideas, new and competitive end users." (Doc. 4-1 at Exhibit B, ¶ 10). Nidec alleges that, based on a review of quotes at comparable facilities for similar scrap, WSR breached this provision by failing to offer higher prices. (Doc. 37 at ¶ 22). Nidec asked WSR to improve its pricing multiple times during the course of the Agreement (Doc. 140-2 at ¶¶ 20-24), and WSR has not suggested its prices were actually the highest available in the market. In fact, Nidec originally selected WSR even though WSR did not offer the highest quotes in the initial 2018 bidding process. (Doc. 131 at ¶ 16).

When WSR moved to dismiss the FAC, the parties offered two competing interpretations of the Guaranteed Price Provision. WSR described the Guaranteed Price Provision as a "Continual Improvement Provision" and suggested it merely "obligates WSR to provide Nidec with the best prices WSR could provide, not to match the best price offered to Nidec by a third party." (Doc. 40 at 5). Nidec responded that the Guaranteed Price Provision clearly required that WSR "provide the highest prices for the scrap." (Doc. 45 at 6). After careful consideration, this Court held that the Guaranteed Price Provision was ambiguous because "reasonable people could disagree as to the proper interpretation." (Doc. 49 at 5). WSR now suggests the Court should grant summary judgment because Nidec's breach of contract counterclaim fails even under Nidec's own interpretation of the Guaranteed Price Provision.

Under Missouri law,[2] a breach of contract claim has the following elements: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to that contract; (3) breach of the contract by defendant; and (4) damages suffered by the plaintiff." *Keveney v. Mo. Mil. Acad.*, 304 S.W.3d 98, 104 (Mo. banc 2010) (citation omitted). When a contract contains ambiguous terms, "a question of fact arises as to the intent of the parties, and thus it is error to grant summary judgment." *Lafarge North America, Inc. v. Discovery Grp., LLC*, 574 F.3d 973, 979 (8th Cir. 2009) (citing *Essex Dev., Inc. v. Cotton Custom Homes, LLC*, 195 S.W.3d 532, 535 (Mo. Ct. App. 2006)). As WSR notes, however, the existence of ambiguities in a written contract does not always preclude summary judgment, which may still be appropriate "where no reasonable jury could find the facts necessary to entitle a plaintiff to relief." *Cherne Contracting Corp. v. Marathon Petroleum Co., LLC*, 578 F.3d 735, 740 (8th Cir. 2009) (citation omitted) (applying Minnesota law).

This Court has held that the Guaranteed Price Provision is ambiguous, and substantial precedent encourages courts to deny summary judgment in such circumstances. *See, e.g.*, *Zeiser v. Tajkarimi*, 184 S.W.3d 128, 132-33 (Mo. Ct. App. 2006) (citation omitted). But WSR's motion for summary judgment does not require the Court to resolve any factual issues regarding the Guaranteed Price Provision. Instead, WSR accepts "as its premise, merely *arguendo*, that [Nidec's] interpretation is correct" and argues that Nidec's counterclaim still fails under its own interpretation. (Doc. 136 at 4). The Court believes this argument in the alternative is permissible and rejects Nidec's contention that this constitutes abandonment of WSR's prior position regarding the meaning of the Guaranteed Price Provision. (Doc. 130 at 2). Accordingly, the

---

[2] The Court applies Missouri law in accordance with the parties' briefing and the Agreement's choice of law provision. (Doc. 4-1 at Exhibit A, Art. 7).

question before the Court is whether a reasonable factfinder could conclude that WSR breached the Guaranteed Price Provision under Nidec's interpretation.

WSR offers three arguments in supports of its claim that it did not breach the Guaranteed Price Provision as interpreted by Nidec. First, WSR could not have breached the provision because Nidec never advised WSR of the industry price it had to match. (Doc. 83 at 5). Second, Nidec did not award scrap metal purchasing contracts based exclusively on who offered the highest price. (*Id.* at 8). Third, Nidec failed to include an express price guarantee requirement in the Agreement despite including such a provision in both its Request for Quotations and a previous contract. (*Id.* at 8-9). The Court finds that each argument raises a fact issue more appropriate for resolution by the jury and does not establish WSR's right to summary judgment as a matter of law.

WSR contends that it "could not have failed to guarantee highest available prices because Nidec did not tell [WSR] the prices [WSR] was allegedly required to guarantee." (*Id.* at 5). There is no explicit requirement in the Guaranteed Price Provision, however, stating Nidec must inform WSR of industry prices. WSR acknowledges there is little caselaw on point but proceeds to rely on *Adams Ford Belton, Inc. v. Mo. Motor Vehicle Comm'n*, 946 S.W.2d 199 (Mo. banc 1997), a case concerning price match guarantees by car dealerships under regulations promulgated by the Missouri Motor Vehicle Commission. The Court agrees with Nidec that this case – concerning advertisements to consumers subject to state regulation – has virtually no bearing on this private contract between sophisticated companies.

Nidec has also explained that it does not share specific competitor pricing information among scrap purchasers because such information is confidential and doing so could lead to allegations of price fixing. (Doc. 130 at 5; Doc. 137 at ¶ 1). Considering WSR has successfully

sealed its own pricing information in this litigation, Nidec's argument should come as no surprise. (Doc. 3 at ¶ 12) ("[WSR's] procedures and price schedules . . . are confidential trade secrets."). At minimum, Nidec's contention that scrap purchaser pricing information is confidential establishes a genuine question of fact. While the parties dispute certain details regarding the late 2019 and early 2020 negotiations, moreover, it appears clear that Nidec at least requested that WSR improve its pricing to match higher pricing available in the industry. (Doc. 131 at ¶¶ 21, 28; Doc. 137 at ¶¶ 3, 6). Interpreting all material facts on this issue in favor of Nidec, a genuine factual dispute exists as to whether WSR breached the Guaranteed Price Provision.

WSR makes much of the fact that Nidec did not exclusively select scrap purchasers based upon who offered the highest price. Nidec admits that WSR was not the highest bidder despite being selected in the 2018 bidding process, and the Director of Indirect Purchases for North America acknowledged that Nidec instead evaluated providers based on total revenue dollars. (Doc. 131 at ¶¶ 16, 26). WSR also notes that Nidec had more express price guarantees in its Request for Quotations and a previous contract with Roca Acero, another scrap purchaser. (Doc. 83 at 8-9; *id.* at ¶¶ 12-15). That Nidec considered factors other than pricing in its bidding process and previously included clearer price guarantees in its scrap purchasing contracts goes squarely to the question of the parties' intent when adopting the ambiguous Guaranteed Price Provision. Because genuine issues of material fact continue to exist regarding the alleged breach of the Guaranteed Price Provision, the Court will deny WSR's motion for summary judgment on Nidec's FAC.

Beyond opposing WSR's motion for summary judgment, Nidec suggests the Court should grant summary judgment in its favor pursuant to Fed. R. Civ. P. 56(f)(1), which provides

that the Court may grant summary judgment for a nonmovant. *See Chrysler Credit Corp. v. Cathey*, 977 F.2d 447, 449 (8th Cir. 1992). Nidec essentially contends that because WSR seeks substantial lost profits as damages for termination of the Agreement, it cannot possibly have guaranteed the highest prices available even under its own interpretation of the Guaranteed Price Provision. That WSR earned profits at NLA under the Agreement certainly does not establish as a matter of law that it failed to offer the highest prices available. Nidec's argument, much like WSR's in support of its motion for summary judgment, merely raises a fact issue more appropriate for resolution by the jury than this Court. The Court denies Nidec's request for summary judgment in favor of the nonmovant pursuant to Fed. R. Civ. P. 56(f)(1).

   B.  Nidec's Motion for Summary Judgment (Doc. 84)

   *Breach of Implied Covenant of Good Faith and Fair Dealing (Count III)*

   From execution of the Agreement until June 2020, Nidec exclusively sold its NLA scrap to WSR. (Doc. 111 at ¶ 6). In mid-2019, WSR improved its pricing at NLA upon request by Nidec. (*Id.* at ¶¶ 17-19). Also in 2019, the parties executed two addendums to the Agreement pursuant to which WSR paid Nidec over eighty thousand dollars in exchange for extensions of the Agreement's term (collectively, the "2019 Addendums"). (Doc. 140-2 at ¶¶ 16-19).[3] In April 2020, Nidec again asked WSR to improve its pricing at NLA, though WSR contends that Nidec decided to switch purchasers at NLA before WSR had any legitimate opportunity to match the competing price. (Doc. 111 at ¶¶ 8, 22-23; Doc. 137 at ¶¶ 3-7). Nidec's request was preceded by onset of the COVID-19 pandemic, which caused a substantial increase in steel prices. (*Id.* at ¶ 7). Nidec then

---

[3] The parties do not consistently reference the same cost for the 2019 Addendums. Nidec's expert mentioned $95,000 (Doc. 140-2 at ¶ 44); the amounts laid out in WSR's SAUMF sum to roughly $50,000 (*Id.* at ¶¶ 16-19); and WSR references paying over $86,000 in its briefing. (Doc. 110 at 7; *id.* at ¶ 43). The precise amount paid is not material at this juncture.

informed WSR it would discontinue WSR's services at NLA, but not the other facilities covered by the Agreement. (*Id.* at ¶ 15). Nidec projects that this decision resulted in a $1.5 million increase in annual revenue. (*Id.* at ¶ 14). WSR claims that the Agreement is no longer profitable to it because of Nidec's change to a new purchaser at NLA. (Doc. 140-2 at ¶ 38). In Count III of the Complaint, WSR alleges that Nidec breached the Covenant by shifting to a new scrap purchaser at NLA in June 2020. (Doc. 1 at ¶¶ 73-79). WSR specifically alleges that Nidec breached when it "exercised a judgment conferred by the express terms of the transaction (to terminate the Agreement)." (*Id.* at ¶¶ 77) (internal quotations omitted).

"Missouri law implies a covenant of good faith and fair dealing in every contract." *Farmers' Elec. Coop., Inc. v. Mo. Dep't of Corr.*, 977 S.W.2d 266, 271 (Mo. banc 1998). The Covenant prevents a party from "exercis[ing] a judgment conferred by the express terms of the contract in such a manner that evades the spirit of the transaction or denies the other party the expected benefit of the contract." *Countrywide Servs. Corp. v. SIA Ins., Co.*, 235 F.3d 390, 393 (8th Cir. 2000) (quoting *Acetylene Gas Co. v. Oliver*, 939 S.W.2d 404, 410 (Mo. Ct. App. 1996)). "The purpose of the cause of action is to 'prevent opportunistic behavior where one party exploits changing economic conditions to the detriment of the other party.'" *Rock Port Mkt., Inc. v. Affiliated Foods Midwest Coop., Inc.*, 532 S.W.3d 180, 188 (Mo. Ct. App. 2017) (quoting *Glenn v. HealthLink HMO, Inc.*, 360 S.W.3d 866, 877 (Mo. Ct. App. 2012)). The Covenant is not, however, "an ever-flowing cornucopia of wished-for legal duties; indeed, the covenant cannot give rise to new obligations not otherwise contained in a contract's express terms." *Comprehensive Care Corp. v. RehabCare Corp.*, 98 F.3d 1063, 1066 (8th Cir. 1996) (citation omitted).

This Court has held that the Agreement is unambiguously non-exclusive. (Doc. 17). Nidec presents a straightforward argument in support of its motion for summary judgment on

Count III: because the Agreement is unambiguously non-exclusive, declining to sell WSR scrap from NLA cannot plausibly constitute a breach of the Covenant. WSR responds that Nidec's theory improperly "collapses an action for breach of the [C]ovenant into that of breach of contract," as the Covenant only "provides relief where the defendant did not breach the contract's express terms." (Doc. 110 at 4). The question before this Court is whether WSR's claim that Nidec breached the Covenant fails as a matter of law based on the undisputed facts.

The Eighth Circuit recognizes that the Covenant "cannot give rise to new obligations not otherwise contained in a contract's express terms." *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 466 (8th Cir. 2002) (applying Missouri law). Courts applying Missouri law have consistently held that the Covenant cannot "be imposed where the parties expressly address the matter at issue in their contract." *Level One Techs., Inc. v. Penske Truck Leasing Co.*, No. 4:14-CV-1305 RWS, 2018 WL 558428, at *5 (E.D. Mo. Jan. 25, 2018) (citation omitted). In this case, as this Court has repeatedly acknowledged, the parties executed an unambiguously non-exclusive contract which permitted Nidec to use other scrap purchasers at its manufacturing facilities. The Agreement does not obligate Nidec to sell any minimum quantity of its NLA scrap – or any scrap whatsoever – to WSR. Though it is a close question, the Court finds that Count III fails as a matter of law because Nidec cannot breach the Covenant by taking action permitted by the non-exclusive Agreement. *See Park Ridge Assocs. v. U.M.B. Bank*, 613 S.W.3d 456, 464 (Mo. Ct. App. 2020) (citation omitted) ("Every contract contains an implied duty of good faith and fair dealing, but there can be no breach when the contract expressly permits the actions being challenged, and the defendant acts under the express terms of the contract.").

The Missouri Court of Appeals' recent decision in *Meridian Creative All., LLC v. O'Reilly Auto. Stores, Inc.*, 519 S.W.3d 839 (Mo. Ct. App. 2017), is particularly instructive and

persuasive. O'Reilly Automotive Stores, Inc. ("O'Reilly") hired Meridian Creative Alliance, LLC ("Meridian") to provide radio and print advertising services. Under the applicable contract, O'Reilly retained Meridian as "its agency." When O'Reilly utilized another agency and eventually terminated the contract, Meridian sued claiming the contract was exclusive. Meridian also alleged that O'Reilly breached the Covenant in terminating the contract.

The trial court determined that the "its agency" language was ambiguous as to exclusivity. But the trial court proceeded to provide instructions which effectively permitted the jury to find that O'Reilly breached the Covenant without first finding that the contract was exclusive. The jury returned a verdict against O'Reilly. The Missouri Court of Appeals reversed, offering the following explanation regarding the relationship between the contract's exclusivity and the Covenant:

> [E]ven if the jury found that the contract was not exclusive, the verdict director allowed the jury to find that O'Reilly breached the covenant of good faith and fair dealing. *That finding would have provided for an inconsistent verdict.* The implied duty of good faith and fair dealing is not a separate claim beyond or divorced from the contract. The covenant cannot give rise to new obligations not otherwise contained in the contract's express terms . . . . *The critical issue of whether the contract was exclusive is a precursor to obtaining judgment on a claim of a breach of the implied duty of good faith. Id.* at 845 (citations omitted) (emphasis added).

In *Meridian Creative Alliance*, the Missouri Court of Appeals clearly held that O'Reilly could not have breached the Covenant if the contract was not exclusive. Otherwise, the jury would have reached "an inconsistent verdict." *Id.* Similarly, this Court cannot allow a jury to potentially find that Nidec breached the Covenant by declining to use WSR's services at NLA where such action was permissible under the non-exclusive Agreement.

The recent *Level One Technologies* decision from this district offers very similar guidance. Level One Technologies, Inc. ("Level One") developed an electronic payment system

for transportation companies. Level One executed a contract allowing Penske Truck Leasing Co., L.P. and Penske Logistics LLC (collectively, "Penske") to use this system. The contract established a standard fee to be paid by Penske to Level One for each transaction processed through the system. While the parties discussed estimated volumes, the contract did not set any minimum threshold. Penske proceeded to develop its own payment software and minimally utilized Level One's system. Level One sued for breach of the Covenant, among other claims.

The court granted summary judgment in favor of Penske on the claim because it "cannot read new terms into the [contract]." *Level One Techs., Inc.*, 2018 WL 558428, at \*6. Level One made numerous allegations of representations by Penske regarding expected transaction volumes. But the court could not identify "any specific supportive piece of evidence demonstrating how Penske evaded the spirit of the [contract] or denied Level One any expected benefit." *Id.* Similarly, WSR alleges that it had an understanding – based on representations from Nidec as discussed further below – that it would be the exclusive scrap purchaser at all facilities covered by the Agreement. But this Court cannot read this "wished-for legal dut[y]" into the Agreement via the Covenant. *Comprehensive Care Corp.*, 98 F.3d at 1066.

These holdings are entirely consistent with numerous other decisions applying Missouri law and finding that a claim for breach of the Covenant failed because the disputed behavior was expressly permitted by the underlying contract. *See, e.g.*, *CitiMortgage, Inc. v. Chicago Bancorp, Inc.*, 808 F.3d 747, 751-52 (8th Cir. 2015); *Id.*; *Bishop & Assocs., LLC v. Ameren Corp.*, 520 S.W.3d 463, 471-72 (Mo. banc 2017); *Glenn*, 360 S.W.3d at 878; *Amecks. Inc. v. Sw. Bell Tel. Co.*, 937 S.W.2d 240, 243 (Mo. Ct. App. 1996). Courts applying the law of other jurisdictions have reached similar conclusions. *B. Thomas and Co. v. Universal Warranty Corp.*, 3 F.4th 1032, 1039 (8th Cir. 2021) (applying Nebraska law) ("[C]onduct consistent with a contract's

terms cannot violate the duty of good faith and fair dealing."); *DC Auto., Inc. v. Kia Motors America, Inc.*, 411 F. Supp. 3d 1137, 1147-49 (D. Colo. 2019) (applying Colorado law); *Thompson v. Combined Sys., Inc.*, 2017 WL 2546611, at *6-7 (W.D.N.Y. June 13, 2017) (applying New York law); *Perfac, Inc. v. Centoco Mfg. Corp.*, No. 12-CV-2955 (PJS/TNL), 2014 WL 1260733, at *5 (D. Minn. Mar. 26, 2014) (applying Ontario law); *The Wisconsin Compressed Air Corp. v. Gardner Denver, Inc.*, 571 F. Supp. 2d 992, 999-1000 (W.D. Wis. 2008) (applying Wisconsin law). This wealth of precedent clearly demonstrates that courts cannot rely on the Covenant to impose new obligations which go beyond the parties' express contractual duties.

The Eighth Circuit has recognized, however, that a party may breach the Covenant by exercising discretion granted under a contract "in such a manner as to evade the spirit of the transaction." *Stone Motor Co.*, 293 F.3d at 466 (citation omitted). In *Stone Motor Company*, General Motors Corporation ("GM") executed a dealership and franchise agreement with Stone Motor Company ("Stone Motor"). The applicable contract specifically provided that GM "reserves to itself discretion in accepting orders and distributing Motor Vehicles, and its judgments and decisions are final." *Id.* at 466 n.4. Stone Motor proceeded to sue for breach of the Covenant in part on the grounds that GM did not provide trucks and sports utility vehicles in adequate quantities. The trial court granted summary judgment in favor of GM on this claim.

The Eighth Circuit, despite recognizing GM's "broad discretion [ ] to allocate vehicles among its various dealers," reversed. *Id.* at 466. The court held that "in light of the restrictions imposed by both Missouri contract law and the [Missouri Motor Vehicle Franchise Practices Act ("MVFPA")], Stone Motor was entitled to have GM exercise its discretion in good faith." *Id.* at 467; *see also City of Joseph v. Lake Contrary Sewer Dist.*, 251 S.W.3d 362, 370 (Mo. Ct. App.

2008) ("[D]iscretion is not unlimited; it must not be exercised to deprive the other party of the benefit of the contractual relationship or evade the spirit of the bargain."). *Stone Motor Company* demonstrates that a party does not have carte blanche to act in bad faith and evade the spirit of the bargain even where the contract offers substantial discretion.

After careful consideration, however, the Court finds that *Meridian Creative Alliance* offers more persuasive and squarely applicable precedent. First, *Meridian Creative Alliance* specifically concerns the Covenant in the context of exclusivity. The Missouri Court of Appeals offered clear and strong language on this issue: "If there was no exclusive contract, there can be no breach of the covenant of good faith and fair dealing." *Meridian Creative Alliance*, 519 S.W.3d at 845. *Stone Motor Company*, in comparison, broadly concerns the limits of a contractual provision vesting one party with substantial discretion.

Second, the franchisor-franchisee context meaningfully distinguishes *Stone Motor Company*. The Eighth Circuit noted that the "purpose of the MVFPA is to level the contractual playing field between local franchisees and motor vehicle manufacturers." *Stone Motor Co.*, 293 F.3d at 464 (citation omitted). In reversing summary judgment on the claim for breach of the Covenant, the court acknowledged GM's "broad discretion" but held that Stone Motor was entitled to have GM exercise such discretion in good faith "in light of the restrictions imposed by *both Missouri law and the MVFPA*." *Id.* at 467 (emphasis added). In the case at hand, Nidec and WSR are sophisticated business entities operating on a level playing field with access to extensive resources (including attorneys). *See Emps. Reinsurance Corp. v. Mass. Mut. Life. Ins. Co.*, No. 06-0188-CV-W-FJG, 2007 WL 1028769, at *3 (W.D. Mo. Apr. 2, 2007) (finding it was "unlikely that one of the parties was able to dominate the other in the negotiation" of the agreement where both parties were sophisticated companies). Finally, the Court notes that the

*Meridian Creative Alliance* and *Leven One Technologies* decisions are far more recent than *Stone Motor Company*.

In its brief, WSR contends that it "does not allege a breach of the Covenant merely by the discontinuance of services at the NLA facility." (Doc. 110 at 5). Instead, WSR claims that Nidec "breached the [C]ovenant in its series of actions that led to the discontinuation of WSR's services [at NLA]." (*Id.*). WSR unsuccessfully attempts to distinguish *Meridian Creative Alliance* on these grounds. WSR discusses numerous facts – both disputed and undisputed – which supposedly demonstrate Nidec's bad faith, such as the 2019 Addendums and Nidec's alleged failure to permit WSR to match a competing price. (*Id.* at 6-10). But this Court must look to the Complaint to assess the nature of WSR's claim. In the key paragraph of Count III, WSR claims that Nidec "exercised a judgment conferred by the express terms of the transaction (to terminate the Agreement)." (Doc. 1 at ¶¶ 77) (internal quotations omitted). The Court agrees with Nidec that WSR's argument essentially amounts to "a distinction in search of a difference." (Doc. 140-1 at 5). While WSR's brief delves into the company's long history of negotiations and discussions with Nidec, Count III ultimately rests on the basic premise that Nidec breached the Covenant by terminating WSR's services at NLA. This Court finds that such claim fails as a matter of law where the parties entered an unambiguously non-exclusive Agreement.

Under Fed. R. Civ. P. 56(a), a movant is only entitled to summary judgment if they can "show[] that there is no genuine dispute as to any material fact" and they are "entitled to judgment as a matter of law." The facts which establish Nidec's entitlement to summary judgment on Count III are indisputable. WSR and Nidec are sophisticated parties who entered a non-exclusive Agreement concerning the sale/purchase of scrap metal from Nidec's manufacturing facilities. (Doc. 111 at ¶¶ 1-3). The Agreement covers seven facilities, including

NLA. Despite the Agreement's pricing exhibit, the parties frequently negotiated price changes and addendums over the course of the Agreement. (*Id.* at ¶¶ 17-19; Doc. 140-2 at ¶¶ 16-19). The COVID-19 pandemic caused steel prices to substantially increase in early 2020. (*Id.* at ¶ 7). In April 2020, Nidec informed WSR that other plants were receiving higher prices for steel scrap and Nidec was "prepared to test the market." (Doc. 131 at ¶ 21; Doc. 140-2 at ¶ 25). WSR offered to improve its pricing per this request, though there is some dispute whether WSR ever had an opportunity to submit a "final proposal." (Doc. 111 at ¶¶ 22-23; Doc. 137 at ¶¶ 3-6). In June 2020, following these negotiations, Nidec began selling its NLA scrap to a purchaser who offered higher prices. (Doc. 111 at ¶ 15; Doc. 131 at 16, ¶¶ 6-8).

The unambiguously non-exclusive Agreement permitted Nidec to terminate WSR's services at NLA when Nidec obtained a better offer from another purchaser. Missouri law recognizes that "[s]ophisticated parties have freedom of contract – even to make a bad bargain." *Purcell Tire & Rubber Co., Inc. v. Exec. Beechcraft, Inc.*, 59 S.W.3d 505, 508 (Mo. banc 2001) (citation omitted). It appears to the Court that WSR is attempting to recover from what it now perceives as a bad bargain via a claim under the Covenant. This Court's holding should certainly not be read as an endorsement of the fairness of every action taken by Nidec in the course of the Agreement. But the Covenant is not "an ever-flowing cornucopia of wished-for legal duties." *Comprehensive Care Corp.*, 98 F.3d at 1066. In accordance with *Meridian Creative Alliance* and other applicable precedent, the Court finds based on the undisputed facts that Nidec did not breach the Covenant by terminating WSR's services at NLA. Allowing WSR to proceed to trial on this claim would risk permitting the Covenant to "give rise to new obligations not otherwise contained in a contract's express terms." *Stone Motor Co.*, 293 F.3d at 466. Accordingly, the Court will grant summary judgment in favor of Nidec on Count III of the Complaint.

*Negligent Misrepresentation (Count IV)*

In Count IV of the Complaint, WSR alleges that Nidec negligently misrepresented that the Agreement constituted an exclusive relationship. (Doc. 1 at ¶¶ 80-87). Under Missouri law, a negligent misrepresentation claim has five elements: "(1) the speaker supplied information in the course of his business; (2) because of the speaker's failure to exercise reasonable care, the information was false; (3) the information was intentionally provided by the speaker for the guidance of limited persons in a particular business transaction; (4) the hearer justifiably relied on the information; and (5) due to the hearer's reliance on the information, the hearer suffered a pecuniary loss." *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 134 (Mo. banc 2010) (citation omitted). Summary judgment on a negligent misrepresentation claim is proper when the proponent cannot provide proof of all elements of the tort. *Colgan v. Washington Realty Co.*, 879 S.W.2d 686, 689 (Mo. Ct. App. 1994). Nidec contends that any supposed misrepresentations related only to future intent, WSR still has not identified the specific misrepresentation, and WSR cannot establish justifiable reliance in light of the unambiguously non-exclusive Agreement.

At the outset, the Court wishes to clarify available damages for WSR's negligent misrepresentation claim. In the Complaint, WSR seeks damages under Count IV for $5,071,000 in lost profits and $71,000 in incurred costs. (Doc. 1 at ¶ 86). But "Missouri follows the pecuniary loss rule, which states that the damages recoverable for a negligent misrepresentation claim *do not include the benefit of the plaintiff's contract*." *Franklin v. Pinnacle Ent., Inc.*, 1 F. Supp. 3d 979, 993 (E.D. Mo. 2014) (citation omitted) (emphasis added). Missouri courts have consistently recognized that parties cannot recover lost profits for negligent misrepresentation claims. *See, e.g.*, *Landmark Infrastructure Holding Co. LLC v. R.E.D. Invs., LLC*, No. 2:15-CV-4064 NKL, 2018

WL 2013039, at *2 (W.D. Mo. Apr. 30, 2018) ("[Plaintiff] could not recover its expected profits on the negligent misrepresentation claim, but it could recover them on the breach of contract claim."); *Frame v. Boatmen's Bank of Concord Vill.*, 824 S.W.2d 491, 495-97 (Mo. Ct. App. 1992) (declining to award benefit of the bargain damages for negligent misrepresentation).

In response, WSR acknowledges it seeks lost profits but contends that it "is not claiming lost profits as 'benefit of the bargain' damages." (Doc. 110 at 14). The Court does not fully understand WSR's attempted distinction and agrees with Nidec that WSR cannot recover its lost profits under a negligent misrepresentation theory. Accordingly, any damages sustained by WSR due to Nidec's alleged misrepresentations are limited to pecuniary costs incurred in reliance on such misrepresentations. The Court finds, however, that WSR and its expert have identified specific pecuniary losses in the form of out-of-pocket expenditures or "actual costs" which may support a claim for damages under Count IV.

WSR alleges Nidec negligently misrepresented that the Agreement constituted an exclusive relationship. The Court finds that discussions between WSR and Nidec preceding execution of the Agreement cannot support a claim for negligent misrepresentation as a matter of law for multiple reasons. First, WSR has not identified a statement regarding the Agreement's exclusivity which a reasonable factfinder could conclude misrepresented an exclusive arrangement and accordingly was false.[4] At his deposition, Mr. Gaddy recognized that neither he nor any Nidec representative employed the word "exclusive" to describe the Agreement. (Doc. 111 at ¶ 11). WSR further admits that it possesses no written statements by Nidec indicating that WSR would enjoy the exclusive right to service Nidec's plants. (*Id.* at ¶¶ 26-27). It appears that

---

[4] The parties dispute whether WSR could amend the pleadings to add additional allegations of misrepresentations. (Doc. 110 at 11; Doc. 140-1 at 8). There is no motion to amend the complaint before the Court.

Mr. Gaddy surreptitiously recorded phone calls with Nidec representatives yet still cannot provide any statements by Nidec specifically discussing exclusivity. (*Id.* at ¶¶ 47-48).

Instead of offering such statements, WSR highlights that Nidec described the Agreement as an "endeavor," and such description "impl[ies] necessarily a long duration." (*Id.* at ¶¶ 28-29). WSR also argues that Nidec's Request for Quotes references a "three-year contract," which supposedly indicates exclusivity. WSR makes general references to numerous conversations between Mr. Gaddy and Nidec which allegedly demonstrate exclusivity, but "some metaphysical doubt as to the material facts" is insufficient to avoid summary judgment. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (internal quotations omitted). Despite the voluminous filings, it remains unclear to the Court precisely which statement by Nidec constituted the alleged negligent misrepresentation. Having failed to identify specific misrepresentations, WSR cannot proceed to trial on the vague notion that Nidec still somehow committed to an exclusive arrangement. *See Gillan v. Wright Med. Tech.*, 396 F. Supp. 3d 844, 847-48 (E.D. Mo. 2019) (dismissing negligent misrepresentation claim for failure to plead specific statements).

This Court has already determined that the Agreement, which establishes a three-year term, is unambiguously non-exclusive. (Doc. 17). In these circumstances, Nidec's description of the Agreement as a three-year term also cannot possibly constitute a negligent misrepresentation because it is not false. Similarly, a reasonable factfinder could not conclude that describing the Agreement as an "endeavor" was false, or that WSR justifiably relied on this word in assuming an exclusive relationship. *See In re Bridge Info. Sys., Inc.*, 314 B.R. 421, 431 (E.D. Mo. 2004) (citation omitted) ("Such general, non-specific statements are mere puffery and do not support a claim for fraud or negligent misrepresentation under Missouri law."). As the Missouri Court of

Appeals has framed it, the law "is not an indulgent guardian which can go to romantic length of giving protection against consequences of indolence, folly or careless indifference to ordinary and accessible means of information." *Hamra v. Magna Grp., Inc.*, 956 S.W.2d 934, 940 (Mo. Ct. App. 1997) (citation omitted). After extensive discovery, WSR has not provided this Court with a single statement made during the course of negotiations which was false.

Second, even if WSR could identify such a false representation, it cannot demonstrate justifiable reliance. A threshold question for WSR's negligent misrepresentation claim is whether WSR can establish justifiable reliance considering it executed an unambiguously non-exclusive contract. The Missouri Court of Appeals has consistently advised courts that a party "cannot defeat the enforcement of a provision of a . . . contract by a mere showing that the other party misrepresented its legal effect or gave assurances that the same would not be binding or enforced." *Affordable Cmtys. of Mo. v. EF & A Cap. Corp.*, No. 4:11-CV-555 CAS, 2012 WL 43520, at *6 (E.D. Mo. Jan. 9, 2012) (quoting *St. Joseph Lead Co. v. Fuhrmeister*, 182 S.W.2d 273, 279 (Mo. 1944)).[5] In *Hamra*, the defendant's representations during negotiations plainly contradicted the language of the contract. Yet the Missouri Court of Appeals still affirmed summary judgment in favor of the defendant because plaintiff could not have justifiably relied on statements which were explicitly contrary to the contract's language. Similarly, WSR cannot justifiably rely on statements which supposedly contradict the unambiguous Agreement.

Third, the statements identified by WSR all pertain to future intent. Under Missouri law, "a negligent misrepresentation claim cannot arise from a statement regarding the speaker's future

---

[5] The Missouri Supreme Court has recognized a potential exception to this principle in the event that one party did not have a reasonable opportunity to know about the contract by reading it. *State ex rel. PainWebber, Inc. v. Voorhees*, 891 S.W.2d 126, 130 (Mo. banc 1995). WSR has not suggested that this exception may apply, and the undisputed facts demonstrate that Mr. Gaddy had ample opportunity to review and negotiate the Agreement but declined to utilize retained counsel. (Doc. 111 at ¶¶ 35-37).

intent." *Clearly Canadian Beverage Corp. v. Am. Winery, Inc.*, 257 F.3d 880, 893 (8th Cir. 2001)

(citation omitted); *see also Mounger Constr., LLC v. Fibervision Cable Servs., LLC*, No. 2:11-

CV-81 ERW, 2012 WL 1745543, at *3 (E.D. Mo. May 16, 2012). This is because "it is

impossible to be negligent in failing to ascertain the truth or falsity of one's own future

intentions." *Id.* (citation omitted). But if a statement "is a representation of the speaker's present

intention or concerns matters within the speaker's control," a cause of action for negligent

misrepresentation may exist. *City of St. Joseph, Mo. v. Sw. Bell Tel.*, 439 F.3d 468, 478 (8th Cir.

2006) (citation omitted). Even if Nidec made representations regarding exclusivity – which WSR

has not established – WSR has presented no evidence suggesting Nidec had contrary intentions

at the time it made the representations. The facts before this Court only suggest that Nidec began

shopping for higher bidders in 2019 and 2020, not during the 2018 negotiations. For each of

these reasons, Nidec is entitled to judgment as a matter of law on any negligent

misrepresentation claim concerning statements regarding exclusivity prior to execution of the

Agreement.

Representations made or implied in connection with execution of the 2019 Addendums

present a more difficult question. As discussed above, the parties executed two addendums to the

Agreement in 2019, pursuant to which WSR paid approximately $90,000 in exchange for

extensions of the Agreement's term. (Doc. 140-2 at ¶¶ 16-19). WSR offers a clear summary of

its argument: "Nidec's invitation to WSR to pay price premiums in return for extending the

[Agreement], which WSR did, was a misrepresentation." (Doc. 110 at 11). The Complaint

alleges, moreover, that the addendum executed in August 2019 was specifically requested based

on stretch revenue targets at NLA. (Doc. 1 at ¶¶ 32-38). Nidec responds that it "simply requested

one-time premium payments; it was Gaddy who asked for extension of the Agreement in

exchange." (Doc. 140-1 at 11). The Court struggles to understand two elements of the 2019 Addendums. First, if not for extension of the term, what consideration supported the one-time premium payments? Second, since the Agreement was non-exclusive, how did extending the term provide WSR any value?

WSR argues that Nidec negligently misrepresented it would continue selling scrap to WSR at NLA when it agreed to extend the term of the Agreement in exchange for lump sum payments. Evidence in the record at least suggests, moreover, that Nidec was already considering alternative purchasers at the time it executed the 2019 Addendums. (Doc. 111 at ¶¶ 17-18; Doc. 131 at 15, ¶ 4). WSR acknowledges that a "negligent misrepresentation claim cannot arise solely from evidence that the defendant did not perform according to a promise or statement of future intent." *Baum v. Helmet Gas Prods., Inc.*, 440 F.3d 1019, 1023-24 (8th Cir. 2006) (citation omitted). But WSR contends that the 2019 Addendums still establish a question of material fact regarding whether Nidec exercised reasonable care by consenting to extensions of the Agreement in exchange for lump sum payments. *See Harleman Mfg., LLC v. Pengo Corp.*, No. 14-CV-3498-MDH, 2016 WL 4544362, at *6 (W.D. Mo. Aug. 30, 2016) (finding question of material fact existed as to whether party exercised reasonable care in statements regarding terms of agreement).

To succeed on its negligent misrepresentation claim regarding the 2019 Addendums, WSR must establish that (1) Nidec supplied information in the course of its business; (2) because of Nidec's failure to exercise reasonable care, the information was false; (3) the information was intentionally provided by Nidec for the guidance of limited persons in a particular business transaction; (4) WSR justifiably relied on the information; and (5) due to WSR's reliance on the information, it suffered a pecuniary loss. *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322

S.W.3d 112, 134 (Mo. banc 2010) (citation omitted). Construing all evidence in WSR's favor, a reasonable factfinder could conclude that by consenting to extend the Agreements in exchange for lump sum payments connected to revenue targets at NLA, Nidec failed to exercise reasonable care and misled WSR into justifiably believing that Nidec would continue selling it scrap at NLA. The Court will accordingly deny Nidec's motion for summary judgment on Count IV as it pertains to alleged negligent misrepresentations regarding the 2019 Addendums. As discussed above, WSR can only recover pecuniary damages for costs incurred in reliance on alleged misrepresentations stemming from the 2019 Addendums.

**IV.     CONCLUSION**

In its FAC, Nidec alleges that WSR breached the Guaranteed Price Provision by failing to guarantee the highest prices available for scrap. This Court has determined that it is ambiguous whether the Guaranteed Price Provision requires WSR to match the highest available industry prices or simply use its best efforts to improve pricing. (Doc. 49). WSR now argues that even if the Court adopts Nidec's interpretation of the provision, Nidec cannot establish a breach because it never provided WSR with a specific price to match. Genuine disputes of material fact prevent this Court from concluding that Nidec prevented WSR from complying with the Guaranteed Price Provision. A jury will be in the best position to assess both the parties' intentions when drafting the Guaranteed Price Provision and whether WSR breached whichever interpretation of the provision the jury chooses to adopt.

While the Guaranteed Price Provision is ambiguous, the Agreement is unambiguously non-exclusive. This Court previously dismissed WSR's claims for breach of contract because they were premised on an exclusive arrangement. (Doc. 17). Nidec seeks summary judgment on WSR's remaining claims for breach of the Covenant (Count III) and negligent misrepresentation

(Count IV). On each count, Nidec primarily argues that selecting another scrap purchaser at NLA cannot plausibly provide the basis for the claim because the Agreement is non-exclusive.

Having carefully considered the parties' arguments, the Court holds that Nidec is entitled to judgment as a matter of law on Count III. The parties executed the Agreement in 2018 but continued to negotiate pricing and additional lump sum payments during the course of the Agreement. Between April and June of 2020, Nidec obtained a better offer for its NLA scrap. Consistent with its rights under the non-exclusive Agreement, Nidec accepted this improved offer and ceased selling NLA scrap to WSR. Recent and directly on point precedent from the Missouri Court of Appeals and this district indicate that such action cannot plausibly violate the Covenant. WSR has not provided any facts which would permit a reasonable factfinder to conclude that Nidec's choosing to switch purchasers at NLA constituted bad faith as opposed to a calculated business decision expressly permitted by the parties' Agreement.

As to Count IV, the Court finds that Nidec's description of the Agreement as an "endeavor" with a three-year term cannot possibly constitute a negligent misrepresentation. These statements are not false, and WSR could not have justifiably relied on them considering the clear, unambiguous language of the Agreement. Simply put, WSR has failed to identify a specific false statement made during negotiation of the Agreement which a reasonable factfinder could find constitutes a negligent misrepresentation. A reasonable factfinder could find, however, that Nidec's extension of the term of the Agreement in exchange for lump sum payments negligently misrepresented that Nidec would continue selling its NLA scrap to WSR. WSR may proceed to trial on this issue and potentially obtain damages only for those pecuniary costs incurred in reliance on Nidec's representations relating to the 2019 Addendums.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff / Counterclaim Defendant WSR's Motion for Summary Judgment on Defendant / Counterclaim Plaintiff Nidec's First Amended Counterclaim (Doc. 82) is **DENIED**.

**IT IS FURTHER ORDERED** that Nidec's Motion for Summary Judgment (Doc. 84) is **GRANTED in part** and **DENIED in part.** As to Count III, the motion is **GRANTED**. As to Count IV, the motion is (i) **GRANTED** with regard to any alleged misrepresentations made by Nidec during negotiation of the Agreement and (ii) **DENIED** with regard to alleged misrepresentations made relating to execution of the 2019 Addendums.

**IT IS FINALLY ORDERED** that, in light of this Memorandum and Order, both parties shall file any supplemental briefing on the pending motions to exclude testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (Docs. 80, 85) within **ten (10) days** of this Memorandum and Order.

Dated this 5th day of May, 2022.

_John A. Ross_____
JOHN A. ROSS
    UNITED STATES DISTRICT JUDGE